I can see that. Good afternoon, everyone. We have five cases on the docket today. However, two of those cases are being submitted on the briefs without oral argument. I will just, for the record, note those two cases. The first one is number 07-3021, Williams v. Merit Systems Protection Board, and the second one is number 07-3110, Raymond v. Office of Personnel Management. Again, those two cases are being submitted on the briefs without oral argument. The first case in which we will hear oral argument this morning, I mean this afternoon, excuse me, is number 06-1305, MEMC Electronics v. Mitsubishi. Mr. Evans? Yes. I just want to confirm you understand how the lighting system works? Yes. And you also want to confirm you've reserved four minutes for your rebuttal. Is that right? Yes, sir. Okay. Well, you can start whenever you're ready. Okay. Please report, counsel. MEMC submits the trial court error excluding the expert report and declaration testimony after this diary. The briefing has boiled it down to two basic issues, axial symmetry and the detection limit. Mr. Spock? On the detection limit, I don't see that there's any evidence that there's a standard for determining a defect level around 1100, but the microscope, it seems to be agreed, only gives you a defect limit of about 3000 or something like that. So what's the support for the notion that his multiple pass microscopic examination could detect defects in the 1100 range? The standard is a volumetric standard with defects per unit volume. So if you only detect thousandth of a cubic centimeter of silicon and you don't find any defects, the most you could say is there were no defects accurate to 1000 defects per cubic centimeter. But I don't think you're answering my question. The question is, what is there in the record suggesting that his methodology is supported by, say, a minority of scientists? It was his testimony, Your Honor, as a person working in the field for 15 years, that that is how the detection limit is handled. Dr. Heidenson... But he didn't show, he didn't indicate that anybody else did it with this multiple pass microscope technology, right? Well, he performed a calculation whereby he showed the detection level he was working at and he showed that he had analyzed a lot more than three passes. He didn't... Yeah, yeah, yeah, but the question is a Daubert question. The question is, did the district court abuse his discretion or her discretion in excluding this testimony? And in order for the testimony for that to be an abuse of discretion, there has to be some showing that this was an established method of doing it, or at least that a minority of scientists would do it this way. It's a reliable method of doing it, right? Yes, Your Honor. Okay, so where's the evidence that the multiple pass approach was an established or reliable method of doing this? It would just be his oral testimony submitted in the declaration. It would be based on his 15 years in the field having applied various detection limits and having said this is how the industry does it. Well, why is that sufficient under Daubert? Well, under Daubert, if you can show that it's something that you do in the ordinary course, not for the litigation, you don't have to show general acceptance of the minority of scientists espousing it. What you have to show is since you do it as a matter of ordinary course, that therefore it's scientifically reliable. And here we would submit it's scientifically reliable because not only did he do three views, he did a lot more than three views, and there's no evidence in the record that anybody has ever found an abnormality defect in the relevant silicon. All evidence in the record, whether it's the commercial data on which millions of dollars worth of wafers are sold has shown no abnormal defects. When we deposed Dr. Furia, their scientist that works in this field, he said that their pure silicon has no COP defects. When our own expert looked at it, he found no COP defects. They published a paper where they said that there are no grown-in defects, which they defined to be abnormal defects. So everyone who's looked at this silicon, it's literally thousands and thousands of views of the silicon. Tens of thousands of cubic centimeters of silicon have been analyzed, and no one has found these defects in the silicon. We submit that that creates an element of liability. I have a related question. Are you through with him on that? I have a related question which admittedly demonstrates my ignorance, and I'm hoping that you can fill in my gaps. The detection limit in the industry, in the art, is 3,300 defects per cubic centimeter. Is that correct? The 3,300 was calculated because the field of view through his microscope created an area that was 0.202 centimeters squared, and so what he did is he took his field of view and multiplied it by the depth of the etch, a 30-minute SACO etch for the FPD test. He'll etch into it 15 microns. When you multiply 15 microns times the 0.202 square centimeter field of view, that's where the 3,300 comes from because it's 1,3300th of a cubic centimeter silicon, and so you get a detection limit of 3,300. Now this field, if you happen to be larger because he had a different eyepiece in it, then he would have had a different detection limit because he would have had a different area, or if he'd done side-by-side views. What seems to be at least partly an issue is whether you can detect down to a thousand defects, 10 to the 3 to the third. Is that below the normal detection level? I think the detection level will depend on the field of view of your microscope, the time period during which you etch the silicon, and how deep it etches. I suspect that 15 microns is about standard for the etch depth, and for the field of view of the microscope, I suspect that the field of view that was in his microscope is about standard. I note though that Dr. Eidenson at A13928, paragraph 18, she's skilled in the art. She testified that she was aware of his detection limit and that she had detected defects at a detection limit at or below 1,000. So it's not something that was... Where did she testify that? In paragraph 18 of her declaration. Where? Appendix number A13... What volume? 928. This is Anna Eidenson. Which expert was this again? This was an expert for silicon. What's the name? Anna Eidenson. This is the point. You note in your reply brief, correct? Yes, Your Honor. Was this brought to the attention of the district court judge, this Eidenson testimony? Yes, Your Honor. Can we... Is there a place in the record where we can see that it was brought to the district court's attention? I can certainly forward it to you after the oral argument. I don't know that I can do it standing here. I understand. Maybe on rebuttal. But it would be helpful to know that. Because I did see that in your reply brief. And it's, you know, it's a pertinent point, but I wasn't... Having seen it there, I think, for the first time, the thought went off, perhaps incorrectly, as to whether it was raised below. This is paragraph 18 of her declaration. Yes, Your Honor. Well, what does she mean by same or similar methods? I would assume she's using a silicon legend microscope. That's how they do the FPD test. Yes, but we can't assume things. How do we know? That's what we've got here. How do we know that she's talking about the same methodology that your expert reported to use? In her papers, which have been this prior in this case, she regularly reports on FPD defects. And the test that you do for the FPD defect is the silicon legend followed by microscopic examination. It's in all of her papers. In many of her papers, the FPD test. Mr. Evans, let me... We have in this case, what was this gentleman's name? I've had problems pronouncing it both in and out of court. What's his name? Mule Stardnow. Okay, Mr. Mule Stardnow. For purposes of this question of whether or not his testimony was incorrectly excluded, what are the... We have in here an expert report and then there's, I think, six separate declarations. What are the critical documents in terms of the report and the declarations that, in your view, establish the error in the judge's exclusion of his testimony? The second declaration is directed to the publications that show that this was all established in the art. So you'd say, first of all, you rely on the second declaration? Yes, Your Honor. Okay. And then what I would rely on for the axial symmetry is that Mule Stardnow, at A01283, when he measured the BMD density... A0 what now? A01283. 1283, okay. What you'll see there is that the wafers have 80 millimeters of vacancy-dominant silicon from the center measured out radially. So whether... That's where he took a strip, correct? A strip, right. So when you're measuring a circle, you only have to measure the radius once to know the diameter of the circle. What he found is that there were 80 millimeters in the radial direction, at minimum, for each of the wafers in one of the groups. And was what you were referring to for Dr. Idenson, is that her name? Yes. Was she, in your view, was she purportedly speaking to the validity of this method of testing? No, Your Honor. What was she speaking to? When Dr. Idenson spoke, she was talking about the detection limits. Oh, okay. For the agglomerated... All right. Where does Mule Stardnow say that this microscopic approach that he's using is standard industry practice? I believe it would be in his declaration, his third or his fourth declaration. They never opposed him, and that's why we ended up doing declarations, I think, extensive motions. Yeah, but I'm just... I want to see exactly what he said. I will find that for you and give it to you in a rebuttal. Okay. So right now, what you're saying, Mr. Ernst, is that you rely on the second declaration, his testimony at A, 1238, and you noted another declaration? Uh, what I was going to at the A, 1287, was to point out the fact that the axi-symmetry point is that there were 80 millimeters of relevant material. We only needed 15 to prove infringement. So whether it wobbles a little, you lose a few millimeters on the axi-symmetry question, it doesn't matter because we can readily find it both at the center of the wafer and in... I understand. What I'm concerned about is this question of excluding his testimony, because it does seem to color the case. It's obviously a better case for you if he's in instead of out. Yes, sir. And you said you rely on the second declaration, and what else do you rely on that you say supports the proposition that he should have been allowed to stay in? In other words, that he gets over the Daubert hurdle? I would say his third declaration talked about the reduction of practice. His fourth and fifth covered the detection limit. His unnumbered declaration covered the co-authored paper where they used his identical methods to present evidence to the world that their wafer would have characteristics that would cover our claims. And you're saying, and this I'll close it out because I don't want to hold you into your rebuttal, but you're saying what you've just cited to us establishes that he met the Daubert standard. And I will amend that perhaps in my rebuttal piece. Well, you had a number of questions, so we'll give you your full four minutes on rebuttal. And on rebuttal, let's talk a little bit about the enablement issue. Thank you, Your Honor. All right, we'll hear from, I guess it's Simcoe, right? It is now, Your Honor. Mr. Rader. Yes, Your Honor. May it please the Court, Terry Rader, appearing before the appellees. Hear your cross appeals in profit. Pardon? Your cross appeals in proper, isn't it? Your Honor, it was a conditional cross appeal. But we've held that if all you're doing is supporting the judgment, it's not a proper cross appeal. Are you aware of those cases? We were concerned that- Are you aware of the case? Yes, Your Honor. Then why did you file a cross appeal? Do you realize that's potentially sanctionable conduct? We filed it, Your Honor, because we truly believe that the rulings that the judge made in connection with infringement were not infringement. What's that have to do with it? If all you're doing is supporting the judgment, you got a decision from the judge of invalidity, and you're supporting that judgment on a different ground. He gave it to you on lack of enablement. You're supporting it on the ground of obviousness or anticipation. What's the basis for filing a cross appeal? Well, Your Honor, the testing that we just discussed in the prior art is the same testing- No, that's not an answer. It's a legal question. When you're not seeking to expand the judgment, you are not entitled to file a cross appeal. In fact, we've said filing a cross appeal and getting extra pages under those circumstances is sanctionable conduct. What's your basis for filing a cross appeal? Our basis, Your Honor, was the good faith belief that we had a position on the cross appeal if this court reversed the non-infringement fine. But that has nothing to do with expanding the judgment. The cross appeal doesn't affect the scope of the judgment. Your Honor, if we erred, we apologize, but we really had a good faith belief, even in view of the cases this court has had on cross appeals. I don't see how you could possibly have a good faith belief. We've decided this exact question several times and said you're not entitled to file a cross appeal under those circumstances. In this particular case, Your Honor, we felt that it was appropriate. What happens to the cross appeal if we affirm the summary judgment on infringement? We've agreed that the prior art under those circumstances would not be anticipatory because of the fact that, as we were just discussing a few minutes ago, the lower court's evidentiary ruling on the testing was such that we believe that there is no abuse of discretion by the district court. In fact, no error has been raised by MEMC. To the contrary, what MEMC is presenting in this appeal is identical to the same arguments that it made to the lower court. With respect to the microscope issue, the microscope issue relates to surface testing, not to volumetric testing. As Judge Armstrong pointed out at page 20 of her opinion, page 60, the issue of the microscope was something, as with everything else that MEMC had presented, that Mule Stagno completely unsupports and has an unscientific explanation that he performed many more abuse. This is exactly the type of imprecise and unscientific testimony that is inadmissible. So we felt that the issue that the court addressed in axiosymmetry was the other issue. The BMD test was— If we go on to axiosymmetry, what's your response to their reliance on your expert as saying that this method of testing for these defects is the same that's known in the industry? Well, Your Honor, this sort of goes back to what we were just talking about. Dr. Eidenson was testifying about invalidity when she made those statements, and she was testifying about invalidity based upon her own publications which show these areas or regions called LTCs. And as the court probably knows, in the case of MEMC, they disavowed—on the issue of axiosymmetric region, where vacancies were the predominant intrinsic point defect and substantially less than 1,000 agglomerated vacancies. But is she talking about the same testing method that Mule Santago used? No, she's not. She's talking about— How do I know that? Because if you look at her publications, she lists the tests that she used, and we've identified them in our own briefing material. She did not use the microscopic test that's referred to. What did she use? She used different types of tests. I think she even used a gold etching kind of test, as well as copper decoration and some of the other tests. But what we found from this, and Judge Armstrong agreed, she kept looking from March of 2004 when she first told MEMC they had deficiencies in their testing, that you can't take a sliver from one quarter of a wafer and use that sliver with this BMD test and characterize the entire surface of the wafer as being either axiosymmetric with respect to the vacancy area or not. We're not talking about axiosymmetric now. We're talking about the agglomeration, the number of defects that are counted, which seems to be what your witness is addressing in her testimony. And the key question here is whether Will Stagner was using the same test that she says is a standard test. She wasn't using the same test that he's talking about, and he never established that it was a standard test. There's no evidence that it's a standard test used by anyone to test for the claimed characteristics. What Dr. Eidenson was talking about was she was using, and we have this on page 11 of our brief, she used selective etching, copper decoration, gold diffusion, and heat treatments combined with x-ray topography. That is not the same as where you're reading from. That's from the record, it's 14739. Mr. Rader, before you run out of time the way Mr. Evans did, could we talk just for a minute about enablement? I realize that the witness problem is here also, but I'm having a problem with the enablement issue. Can I ask you a question about it? Yes. The trial judge correctly references In re Wans and sets out more or less the seven factors that we've described in In re Wans as being relevant to the question of whether undue experimentation would be required. Yes. And the trial judge dealt with that on summary judgment. But my question to you is, what happened to the enablement as a question of law with underlying facts? Is that correct? Well, Your Honor, if I could address this. Is that the proper statement of the rule? I mean, would you agree that's the rule? I would agree that certainly enablement, the ultimate conclusion of enablement as a matter of law with underlying facts. The seven factors that In re Wans described are basically factual inquiries. And Judge Armstrong made factual inquiries under every one of those factors. Well, that's the problem. She did it on summary judgment. Nowhere in her opinion could I find her ever saying no reasonable jury could find the facts other than the way she found them. I thought there was a request for a jury trial, wasn't there? There was, and there is. And aren't they entitled to a jury trial on genuine material issues, genuine issues of material fact that are in dispute? We don't believe so, Your Honor, because of the fact that- You're not entitled to a jury trial on genuine issues of fact that are in dispute? Well, there aren't any genuine issues of fact in dispute. That's the reason she was able to grant summary judgment. Don't you agree that she made a mistake in requiring corroboration of the evidence to support the patent? There's no requirement that the patentee in supporting a patent have corroborated evidence, is there? Well, there is in the case where we have their use of that to support the enabler. Here, what they did- Wait, wait, wait. That has nothing to do with the enabler. What case suggested that when a patentee is providing evidence to support the validity of a patent, that that evidence is rejected unless it's corroborated? What case says that? I agree. That case does not exist. Right, so she made a mistake. I don't think so because she made findings relating to the undisputed- No, no. On this point, on the corroboration requirement, she made a mistake, right? I would not agree that she made a mistake. The answer is yes. She clearly made a mistake, but your answer is it's not relevant to the outcome. And it's not relevant to the outcome. Now, go back to my question, which is how could she decide all these factual issues and never say no reasonable jury could have come out this way, and therefore, I'm giving summary judgment? Because all those factual issues as to whether undue experimentation were required were what this whole argument was all about. The question was whether the patent was sufficiently clear about how you do the hot zones and how you do all the rest of it. Wasn't that what all this argument was over? But on the evidence that the court had, it looked at the unobjective two declarations of the three experts, Park, Wildes, and Idinson. That's not the question. The question is not whether you put in evidence that would support a finding of lack of enablement. The question is, is there a genuine issue? And there's evidence on the other side, isn't there? There's no evidence on the other side that there's a genuine issue of material fact. We have a very full disclosure in the patent. And there was testimony about the adequacy of that disclosure. That testimony was not reliable because when it came to the actual issue of enablement, Your Honor, they only relied upon this one document, which is a very passing casual reference to L-band. I don't understand what you're talking about. They're declarations from both inventors saying that the hot zone problem could be solved using knowledge of those skilled in the art without undue experimentation, right? Look at the Park patent also. The Park patent has a substantially greater amount of detail. Plus, the Park patent is directed to method, the method of not to a product. This case is very similar to the Harold. Before you get away, isn't there testimony from the inventors here that the hot zone problem could be solved without undue experimentation? But that's testimony from the inventors without any support from the disclosure. Well, that's the point. That you're saying there has to be some sort of corroboration. They say that the disclosure is sufficient to enable one skilled in the art to do this without undue experimentation. That's contrary evidence, isn't it? And they so testify, right? They did so testify, but the fact is- So that sets up a fact question. Is it true that anyone skilled, a person of ordinary skill in this art could figure out from reading that patent, I certainly couldn't, but I'm not one skilled in that art, could read that patent and figure out how to do this in a way that you get below 1,000 defects or what the rest of that. You say, your experts say, no, it can't be done. Their experts say, oh yes, all you have to do is tweak the hot zone and have a little of this, a little insulation and do a few things. And it'll vary from manufacturer to manufacturer, depending upon how they do it. They have all that in there. And I can't find, perhaps I missed it. Can you help me find in the trial judge's otherwise excellent opinion where she says, aha, these facts are not genuinely in dispute and no reasonable jury could have said so. Those precise words, especially the last few words about the jury, I agree. But if I would refer you to page 47 of her opinion, A87, she talks about, and again, it may have been a mistake in her referring to it as corroborating evidence, but the fact is this is the only evidence that MEMC has on the issue of enablement. It's the only one. But that's just not true. The patent itself creates a presumption of validity. Which can be rebutted, obviously, if there is a situation like we have here where when tested, they relied upon only the L band. So the judge accurately and correctly found, even if she didn't use the precise words, she found that there were only genuine issues of fact. But those precise words are critical to her ability to give summary judgment. She has got to tell us that she has sufficient grounds to say that I don't have to go to a jury on these disputed facts because no reasonable jury could have found for these people. I think Judge Plagg is correct, and I'll just add that I find it very difficult. I'm having a hard time being comfortable with the grant of summary judgment on the enablement issue when you stack up on one side your experts and on the other side the park patent, which doesn't talk about a process but talks a lot about the development of the hot zone. And then also to what Judge Dyke was affirming, the declarations. You may very well win, I don't know, on a trial, but I don't see how anybody can say they're not genuine issues of material fact on the enablement issue here. Well, Your Honor, I think that Judge Armstrong did an exceptional job, an extraordinary job of going through the record, a very complex record. I mean, she kind of veered into fact-finding maybe and saying who's credible and who's not. I think that she did exactly what a district court judge should do in connection with being presented with opposing sets of positions and looking at it and determining on the basis of that record whether there was a genuine issue of fact on the issue that she was making a decision on. Let me ask you, Mr. Reed, going back to the matter we were discussing earlier about the exclusion of Mr. Milstagno's testimony. Dr. Eidenzohn, I guess your expert, said that I am familiar with the detection limits that are described in the 302 patent. We used the same or similar methods for evaluating the 1986 crystal that we had created. We used a detection limit that was no higher than 10 cubed defects and so forth. I think you pointed out that's a 13,928 at paragraph 18. Doesn't that buttress? Why does that not buttress his credibility, not his credibility, but buttress his at least being allowed to appear, not being knocked out on a d'Albert basis? Well, because the testimony has to be both reliable and have to fit the situation. There is no scientific. Judge Armstrong asked them to come forward with a scientific document that would show that there is any standard test for axial symmetry, any standard test for detecting defects. We're talking about the agglomeration issue here. Less than 1,000 defects per cubic centimeter. There is no standard test for determining the defects? There is no test for determining defects in less than 1,000 defects. They were given two years to find a scientific document, between 2004 and 2006 when she made her ruling. Well, what do your quality control records mean when they say that they're defect free? I've got to say, I'm very troubled by the fact that you apparently didn't produce a witness who was knowledgeable about those records and able to testify as to what they meant. Those records do not mean that the detection... Why didn't you produce a witness to testify about the records? Because the testimony was given that if it said zero defects, that was only pursuant to the test that Mule Stagno had done, which we had already established could not detect down to the sensitivity of less than 1,000 defects per cubic centimeter. There's testimony that your quality control used the same test that he used? No. No, there's no testimony. What test did they use? Did your witnesses testify as to what your quality control records meant? These were not tests that were done at our client, it was done at... No, that's not my question. You have quality control records which say that this material is free of agglomerated defects, right? No. No? No, there's no testing other than for defects, and the D defect, which is for COPs only, not for agglomerated oxygen complexes that we refer to as... In which Dr. Eidenson was referring to as LDCs. There's no testing for that done in the industry? There is testing done for D defects, and the testing is... Agglomerated, you got to use the same terminology. Agglomerated defects, is there... Agglomerated vacancy defects, is there testing in the industry done for that purpose? It's not... That's the problem, Your Honor. The testing is not done for the words vacancy, agglomerated vacancy intrinsic point defects. It's for D defects, which are COPs. Are they the same? No, they're not the same. I'm sorry. Mr. Rader, I just, since you're about to run out of time or already have, I just want you to understand, don't misunderstand my question to you. Had this been a trial, she might very well have come out with the right answers. The question is, are they entitled to a trial? And if they're entitled to a trial, are they entitled to a jury on the fact issues? That's what's puzzling me. I think this is the problem, Your Honor, because of the issue that this court is looking at probably one of the best reasons, most detailed, and very consistent with this Federal Circuit's principles. I love her opinion. It's a shame she didn't try the case. But she, I think she concluded, she may not have added the additional words, no reasonable jury, but it's very clear if you read through her opinion and her judgment, which I understand this court clearly is more interested in the judgment, whether it's correct. And the fact is she determined in her own mind and through the opinion she wrote that there were no genuine issues of that. And she can grant summary judgment based upon that. Thank you, Mr. Rader. We'll hear from Mr. Evans. Mr. Evans, now let me figure out here so that everybody gets the same amount of time. Yes, Your Honor. Let's see. Correct me if your count comes up wrong. Mr. Rader had six extra minutes, okay? So that takes him up to 21 minutes, right? Yes, Your Honor. Okay. You had, you went over by about two minutes into your four minutes, okay? All right. So that takes, so that took you up to 17, okay? So why don't we give you, we'll give you a full five minutes. Is that about right? Thank you, Your Honor. Sure, is that about right? Yeah, I love it. Hopefully that's about equal. So. And if it isn't, there's nothing you can do about it. Mr. Benjamin, if you could give Mr. Evans a full, I'm trying to make it equal serving as I'm saying that. I think that's about right. Are you comfortable with that? Yes, Your Honor. Okay. If I could address some questions on the table first. In her opinion at page 41, A0081, she expressly discussed Ivan's abuse of a lower detection limit. So not only did it cause the judge's attention, but she also discussed it in her opinion. Where's that again, Mr.? In page 41 of her opinion at lines 17, 18 down to 24. And this is, you're saying she's focusing in on what we discussed that was a joint appendix 13,000, 928. Yes, where Dr. Evans had mentioned that she had used lower detection limits. You'd asked earlier about where did Dr. Mostago explain, where was our support? Which issue, would you help me? Which issue are you addressing? The visibility of the expert witness? You're back to that one. Visibility of the detection limit on Dr. Mostago's reliability for going down to one times 23rd. And the agglomeration. Yes. Save a minute of your rebuttal time to talk about enablement, which you never mentioned in your opening argument. I will, Your Honor. That page would be at A17,032, paragraph 3 there. 17,032? Yes. 17,032. Over 17,033. There's a paragraph 3 there that explains in detail how he implemented the standard. And I believe when a patent is run by a psychographer and they explain a test that's as mechanical as defects per unit volume, that you don't have a situation where you need to go outside to a publication. If he says four gallons of chemical per 10 gallons of water, you can't do that. Where does he say that this is standard in the industry? It doesn't say that it's standard in the industry, but it defined it in the definitions of the patent. That there was a special section in the back of the patent where it gave a definition section. Oh, wait. You're looking back in the patent now? Yes. Where the patent defined what it means to be substantially free of agglomerated defects. And I'm looking now at column 15. 15? Column 15. Column 15, line 47. Yes, Your Honor. Substantially free of agglomerated intrinsic point defects shall mean a concentration of detection limit of these defects, which is currently about 10 to the third defects per centimeter cubed. But it doesn't tell you how to determine the number of defects. The patent doesn't, right? The patent tells you that you can detect defects. It doesn't tell you what method is a reliable method to use for that purpose. But it identifies the effect. Correct? Yes. Right? Yes, it does not tell you. I think it does, though, Your Honor, because it identifies an FPD as an agglomerated defect. Agglomerated vacancy defects come with multiple names for the same thing, which is why we get this confusion. A D defect is a COP, is an FPD, is a void. And the reason that the patent used agglomerated defect is so we'd have one word for all of them. But OK, but where does it tell me what method is to be used to test for that? And how do I know that's the same method that mules stagnant? Because an FPD stands for flow pattern defect. And the reason it's called that is because when the sacral etching etches into the silicon, it forms a gas bubble, and that creates a flow pattern. OK, I understand. But the question is, is there a standard methodology for measuring this that everybody would know? There's a standard 30 minute x-ray. There's a standard look at it under the microscope. And when you calculate the rotation. Does the patent refer to looking at it under the microscope? It's understood when you say FPD that you have to look at it under the microscope because it's too small to see with the naked eye. When it says FPD, it means you have to etch it. That gives you the gas bubble, gives you the flow pattern. But you can't see those. Yeah, yeah, I understand. But he said that he had to make these multiple passes. And my understanding of what the district court said was that this multiple pass approach has not shown to be reliable or in use in the industry, right? It depends on the field of view of your microscope, how much silicon you're looking at. Well, we never really got into that issue. I tried to introduce it earlier in the debate because as near as I read the record, there is no standard methodology for getting down to 10 to the third defect measurement. He explains it by saying, well, if I look at three slices, I go from 3300 to something like 1100, which is substantially the same as 1000, right? Isn't that what he says? I can't make sense out of that. It makes no sense to me to say your methodology leads you to 3300 as the closest level you can detect. But if you look at three pieces of 3300, suddenly you're seeing 1100. Explain that to me. It's defects per unit volume. Where the 3300 comes from is that through a 50 power microscope, you'll be analyzing silicon that has been etched. And the volume of silicon that's been etched is one 33,000th or 3300th of a cubic centimeter of silicon. It's a volume test. And so what's happened is if you look through just one field of view, you need to look through 3300 views at 50 power to look at a full cubic centimeter. So if you don't see any flow patterns in just one view, the other 2,999 might have a flow pattern. So you can't say it's zero. You can only say it's zero accurate to 3300 per cubic centimeter. That's where it came from. He calculated that and showed that. And so if his field of view expands and he looks at more silicon, if he looks at something where there's just a thousandth of a cubic centimeter, then he can say zero. And I know there's not any in that one, but I don't know about the other 999 until I get the full cubic centimeter, which is what the patent's lexicography tells me. Why did you not have an outside expert to testify to the detect element? I didn't have an outside expert, Your Honor, because this is a very tight industry. There's only three or four major competitors. We couldn't find a disinterested witness who had the tools and the experience to do this. The expert we did use had 15 years of experience, and we didn't perceive this as being an issue that would be a contest. Thank you, Mr. Evans. Thank you, Mr. Rader. The case is submitted. Thank you.